## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**RAFAEL A. QUILES-RODRÍGUEZ**,

    Petitioner,

    v.

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

Civil No. 20-1311 (BJM)

### OPINION AND ORDER

Rafael A. Quiles-Rodríguez ("Quiles") seeks review of the Social Security Administration Commissioner's ("Commissioner's") finding that he is not entitled to disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 423. Rivera contends that the Administrative Law Judge ("ALJ") failed to properly consider his obesity in the sequential evaluation process and to assess his ability to perform past relevant work. ECF Nos. 1, 13. The Commissioner opposed. ECF Nos. 15-16. This case is before me on consent of the parties. ECF Nos. 1, 3. After careful review of the administrative record and the briefs on file, and for the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

### STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted).

The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; see *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in Appendix 1 of the regulations, impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to step four, at which point the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant's impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant can perform other work

available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health & Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the transcript ("Tr.") of the record of proceedings.

Quiles was born on October 22, 1955, has undergraduate studies, does not understand English but communicates in Spanish, and worked as a loan officer from 1979 until he stopped working on June 18, 2016 (alleged onset date) at age 60 due to diabetes mellitus type II ("DM"), high blood pressure, neuropathy, asthma, back and waist pain, heart disease, left leg and right knee pain, and an emotional condition. Quiles applied for disability benefits on June 28, 2016. He last met the insured status requirement on September 30, 2021 (date last insured). Tr. 23, 626, 657-659, 668.

### *Physical conditions*

### State Insurance Fund ("SIF")

On July 17, 2015, Quiles filed a disability claim with the SIF due to a work fall that occurred on July 13, 2015. Tr. He had cervical and lumbar pain and a right knee contusion. Tr. 82, 146, 293-296. Cervical and lumbar spine x-rays revealed straightening of the lordotic curve and discogenic disease at the cervical and lumbosacral levels. Tr. 141-142. A right knee x-ray showed a small suprapatellar effusion, with degenerative changes of the osseous structures and decreased femoral tibia joint space. Tr. 140. Quiles commenced treatment under SIF auspices. Medications were prescribed and Quiles was referred to physical therapy and rehabilitation. Tr. 111-113, 742-743.

SIF follow-up notes from August to December 2015 indicate that Quiles had cervical, lumbar and right knee strain, with decreased flexion and extension in his right knee, and cervical/lumbosacral pain with lumbar paravertebral inflammation and decreased range of motion ("ROM"). Quiles had good tolerance to the physical therapy sessions. Both hands and respective fingers were normal. Tr. 114, 116, 125-129, 133, 289-292. An electromyography nerve exam of the lower extremities was performed on August 31 with a finding of peripheral neuropathy. Tr. 132. An October 13 right knee MRI showed complex tear of the posterior horn medial meniscus, complex tear of the body/posterior horn lateral meniscus, suspected anterior cruciate ligament partial tear, medial femoral condyle bone bruise, joint effusion, anteriorly soft tissue swelling, and lateral collateral ligament sprain. Tr. 131, 135. The SIF Administrator determined on November 17 that Quiles should be awarded permanent partial disability for these conditions because they arose from the work-related accident. Tr. 133, 164. Orthopedist Dr. Manuel Benítez diagnosed Quiles with right knee lateral and cruciate medial meniscus tear and performed on Quiles right knee surgery (arthroscopy and partial meniscectomy with possible ACL repair) on December 1. Tr. 129-130, 138, 147, 155-157, 767-771. Quiles still felt right knee and low back pain with ROM limitations on December 15. Tr. 286.

Physical therapy notes from January 2016 indicate that "[s]ixty-year-old patient reports he has been feeling well for a few days; however, continues with pain on posterior side of his right knee." Tr. 160. Pain was accompanied by cramping and his movement pattern was antalgic. Knee flexion was at 115 degrees, and extension at 20 degrees. No atrophy, muscle spasm or loss of sensation were detected. Muscle tone was normal. Tr. 160-161, 298-299.

A lumbosacral spine MRI dated January 21, 2016, revealed multilevel, multifactorial discogenic disease resulting in spinal canal stenosis and neural foramina narrowing, mild scoliosis, and degenerative spondylosis. Neurosurgical evaluation was recommended. Tr. 373.

Progress and physical therapy notes from February through June 2016 indicate that Quiles had started working again but reported feeling too much pain in the lumbosacral area, radiating to his left leg, when going up and down the stairs. He had right knee and lumbar pain with inflammation and decreased ROM and leg cramps. The pain radiated to his right leg and buttock. He also had a moderate muscle spasm and loss of muscular strength. Quiles ambulated with difficulty, with a mild limp (gait). Torso ROM was limited. There was also mild edema, but no

atrophy or contracture. Muscle tone was normal. Sensation was not affected. Medications were prescribed. Quiles also reported having had foot surgery. Tr. 117-118, 279-285.

Quiles was granted partial disability benefits on May 24, 2016. Tr. 82.  He stopped working on June 18, 2016, due to major depression and lumbar spine degenerative disc disease. Tr. 109.

Physical therapy notes from November 2016 indicate that Quiles had severe right knee and cervical/dorsal pain and limped all the time. He ambulated with difficulty and his gait was antalgic. Neck and torso ROM were limited. Tr. 119-120.

**Dr. José L. Mercado-Santiago and Dr. Cristina Benero**

October 2014 progress notes show that Quiles had right knee pain, DM, high blood pressure, and hypercholesterol. Pain level was a three on a scale of five. Tr. 393. March 2015 progress notes show that Quiles was diagnosed with thoracic back pain, cervicalgia, and lumbalgo. Medications were prescribed. Pain level was a three on a scale of five. Tr. 392.

April and May 2016 progress notes indicates that Quiles reported having shortness of breath and was treated with Albuterol but without improvement. He also felt lower back pain after a mild exertion. Pain level was a five on a scale of five.  Diagnoses included COPD exacerbation, major recurrent depression, persistent insomnia, generalized anxiety, lumbago, and muscle spasm. Medications and diabetic/low fat diet were prescribed. He did not require assistance getting dressed, bathing, using the toilet, transferring, with continence, or feeding himself. Tr. 276, 388-390.

A June 28, 2016, progress note indicates that Quiles was evaluated for shortness of breath and lumbar pain and movement limitation in his left leg, and was diagnosed with muscle spasm, lumbago with sciatica, and acute exacerbated COPD. Pain level was a four on a scale of five. Medications were prescribed. This time, he required assistance getting dressed, bathing, using the toilet, transferring, and with continence. Tr. 277.

Notes from July through December 2016 indicate that Quiles still felt lower back pain radiating to his legs, which had not improved with treatment. Pain level was a five on a scale of five. He was diagnosed with chronic back pain, lumbar sprain, degenerative disc disease, and major depression, recurrent. His back and knee pain caused him depression, anxiety, and insomnia because his conditions did not improve. He also continued with chronic muscle spasms and COPD. Quiles had difficulty walking and used a cane and a knee brace. His body mass index ("BMI") was

30.1. In general, he did not need assistance with his self-care activities of daily living. Tr. 380-385, 408-414.

Treatment with medications and diet continued January through October 2018 for polyneuropathy, lumbago, muscle spasm, Type 2 DM, major depression, insomnia, generalized anxiety, and COPD. Quiles continued experiencing severe pain and had difficulty walking. He used a cane and required some help for his self-care.  The doctors considered he was a fall risk. Tr. 427-437, 1101-1110.   A lumbosacral spine x-ray dated June 26, 2018, showed post-surgical changes, including hardware, at the L3, L4, and L5. Multilevel spondylosis, degenerative endplate changes and disc space narrowing were also identified. Tr. 438.

**Buen Samaritano Hospital**

In June 2016, Quiles was treated at the Buen Samaritano Hospital for bronchial asthma, uncontrolled DM, and hypertension. Medications were prescribed and administered. Tr. 167-274. He fell sick after cleaning at home with a mixture of detergents. Tr. 167-169. He was also placed on a diabetic diet. Tr. 260. Echocardiograms dated June 21 and 24 revealed mild to moderate hypertrophy of the left ventricle. Tr. 173-176. Notes also indicate that Quiles was overweight and a chronic smoker, had a history of asthma, and was admitted with cough and acute bronchospasm. Tr. 170, 177. Physical exam was normal, including the musculoskeletal and neurological system exams. "Muscle strength 5/5 in all major groups."  Tr. 177-178. Progress notes dated June 25 indicate that Quiles signed a waiver and abandoned the hospital after being advised about his condition and possible complications for abandoning treatment. Tr. 263.

**Dr. Aracelio Camacho-Vega**

Quiles reported that Dr. Camacho treated him for high blood pressure, DM, and a heart condition. Tr. 664. Dr. Camacho prepared a medical report for the Disability Determination Services, dated September 3, 2016, which states that Dr. Camacho first examined Quiles in March 2011. Diagnoses included discogenic disease and lumbosacral back pain (neuralgia). Prognosis was poor, and Dr. Camacho opined that Quiles was unable to work.  Tr. 1043-1045. The record also contains a cervical spine MRI dated August 6, 2010, ordered by Dr. Camacho, which revealed spinal canal stenosis. Tr. 407. Most of the 2016 to 2018 handwritten notes available in the transcript are illegible to me. Tr. 394-398, 439-475.

In 2016, Dr. Camacho treated Quiles for constant lumbosacral pain. Quiles had difficulty walking and used a cane. Tr. 394-398. Quiles was referred to Dr. Basiliso Lugo-González,

anesthesiologist, who administered an epidural block and prescribed medications for low back pain on August 3. Tr. 372, 374, 995-996, 1023-1024, 1026.

In 2017, Quiles had a lumbosacral sprain. Diagnoses also included DM and COPD. Blood pressure was controlled. Medications were prescribed.  Tr. 451-458, 1151-1158.

Notes from 2018 show treatment for high blood pressure and DM. Pain level in October 2018 was between four and six on a scale of ten. Tr. 441. Quiles's BMI was between 30-31. December 2018 notes indicate that Quiles was a fall risk because of his age (over 60 years old). He did not require assistance for his self-care routine. Medications were prescribed.  Tr. 439-451, 1139-1150. Medications included sleep aids for his insomnia and pain. Tr. 56.

**Dr. Héctor A. Vargas-Soto (orthopedic spine surgeon)**

Quiles had a plate with two discs and five screws placed in his lower back. Tr. 40. L3-S1 surgery took place on February 7, 2017, and Dr. Vargas's certified on June 27, 2018, that "[t]he surgery was necessary due to the symptoms presented by the patient; otherwise, he could have been left paraplegic. This surgery involves the use of permanent titanium implants. Therefore, [Quiles] will be completely disabled to work beginning on <u>February 7, 2017</u>, indefinitely." (Emphasis in original). Dr. Vargas recommended the following restrictions to avoid further complications: "The patient cannot lift/carry more than 15 pounds over his shoulders. He cannot pull/push more than 15 pounds. He should not bend/twist more than three consecutive times. He should not squat, bend forward or backwards, perform activities requiring sudden movements, balance, stand or sit without changing positions for more than 30 minutes, walk long distances (no more than 100 meters non-stop), climb more than 10 steps non-stop, or travel more than 30 minutes without stopping or resting. The patient can articulate as needed. These restrictions are permanent." Tr. 416.

A March 24, 2017, thoracic and lumbar spine x-ray revealed multilevel spondylotic changes of the thoracic spine, status post posterior spinal fusion in the lower lumbar spine including hardware, and atherosclerosis. Tr. 1085.

A September 9, 2017, x-ray of the lumbar spine revealed transpedicular screws at L3, L4, and L5 vertebral bodies. The vertebral body height was adequate but there was decrease in the intervertebral disc space at L3-L4, L4-L5, and L5-S1 levels. The x-ray also revealed grade I anterolisthesis of the L3 over L4 and L4 over L5 vertebral bodies, straightening of the lumbar

lordosis, lumbar spinal spondylosis, hypertrophic changes in the posterior elements of the lumbar spine, and atheromatous calcifications in the abdominal aorta. Tr. 1088.

The cervical spine x-ray, also taken on September 9, 2017, showed that the vertebral bodies were normal in height and alignment, but there was diffuse narrowing of the intervertebral disc spaces. There was also calcification of the paraspinal soft tissues "which is concerning for carotid bulb calcification" and should be further evaluated, and endplate changes and "very large" marginal osteophytes throughout the cervical spine. Tr. 1089.

Handwritten progress notes from September 2010 and September 2016 are illegible. Tr. 1063-1065.

**Dr. Ruben Torres-Benítez (physical and sports rehabilitation)**

Dr. Torres-Benítez evaluated Quiles in February 2017 for physical rehabilitation for left knee pain and swelling. His knee would lock. The pain was worse with walking, climbing stairs, and after prolonged sitting. Rehabilitation included ten sessions of physical therapy, right knee aspiration of the suprapatellar joint effusion and injection (performed on December 14, 2017, and March 1, 2018), post-injection care, and pain medication to decrease axial pressure and pain. A right knee MRI dated April 19, 2018, showed severe osteoarthritis in the knee joint and patellofemoral joint; peripheral subluxation, degenerative changes, and tear of the medial and lateral meniscus; sprain of the anterior cruciate ligament; large knee effusion; small popliteal cyst; and prepatellar bursitis. Dr. Torres-Benítez noted on May 3, 2018, that Quiles continued with severe pain and limited mobility and assessed that Quiles needed surgical intervention for right knee replacement. Tr. 1112-1121.

**Dr. Norberto Báez-Ríos (orthopedic surgeon)**

Quiles had a total right knee replacement performed on May 24, 2018, due to right knee degenerative arthritis. Dr. Báez reported on July 20 that Quiles was under active orthopedic treatment and was to remain on rest status until September 23. Dr. Báez placed Quiles under the same restrictions as Dr. Vargas, excluding the assessment about the permanency of the restrictions (see above, Tr. 416). BMI at the time of surgery was 29.6. Hospital discharge summary indicates that Quiles had tried all conservative treatment with no relief for right knee severe degenerative joint disease, that the prognosis for the right total knee replacement was excellent, and that he was also diagnosed with DM and major depressive disorder, single episode, unspecified. Tr. 417, 420-426.

A right knee x-ray taken on June 26, 2018, revealed a well-preserved total knee prosthesis in anatomic alignment. Tr. 419.

**Dr. Mildred Caro (pneumologist)**

December 2017 notes indicate that Quiles developed asthma after mixing detergents a year prior. Examination of the lungs showed bilateral wheezing. Dr. Caro diagnosed uncontrolled bronchial asthma, arterial hypertension, and DM. Medications, including an inhaler, were prescribed Tr. 1125-1127, 1130. Notes from September 2018 show that Quiles had uncontrolled bronchial asthma and acute bronchitis. Blood pressure was 122/70. Tr. 1124. On October 3, 2018, a forced vital capacity test showed that Quiles had a moderate restriction forcibly exhaling air from his lungs after a deep breath. BMI was 32.4. Notes that day indicate that the bronchial asthma was partially controlled. Tr. 1123. In December 2018, Quiles had bronchial asthma with exacerbation. Tr. 1122.

**Dr. Walter Nieves-Torres (ophthalmologist)**

Dr. Nieves treated Quiles for cataracts, from October 2008 to January 2019. Notes from 2011 and 2019 indicate that Quiles complained that car headlights blinded him when driving at night. In 2011 and 2013, Quiles noticed a decrease in his near and distance vision, specially at night. He was oriented about cataract surgery. Record contains vision measurements.  Tr. 476-490.

*Mental conditions*

**Dr. Ingrid Alicea-Berrios (psychiatrist)**

Progress notes from February, March, and October 2015 indicate that Quiles suffered from major depression and anxiety. Symptoms included low energy, low self-esteem, feelings of hopelessness/abandonment/burden, loss of appetite, insomnia, somatic complaints, and excessive worrying. He denied having suicidal or homicidal ideation. Medications were prescribed. Tr. 368-370, 1020-1022.

*Procedural History*

In a face-to-face interview with Quiles on the date of his application, the interviewer noted that Quiles arrived accompanied, used eyeglasses, and had difficulty sitting, standing, and walking. Quiles needed help to stand due to back and leg pain. Tr. 669.

In the disability report filed along with his application, Quiles listed "loan officer" as his most recent job, from 1979 to 2016. Tr. 659. His job required him to have technical knowledge or skills. He had to write and complete reports, and use machines, tools, or equipment. He would lift

at most fifteen pounds, and frequently lift five pounds (one-third to two/thirds of the workday). In a workday, he would walk for 3 hours, stand for 2.5 hours, sit for 3.5 hours, climb/stoop/kneel/crouch for 4 hours, never crawl, and handle/write/type/reach for 6 hours. He did not supervise others. Tr. 660. Quiles claimed that the following conditions limited his ability to work: lung problems, diabetes, high blood pressure, a big heart, neuropathy, asthma, neck/back/waist/left leg pain, right knee surgery, spurs, fatigue, insomnia, depression, anxiety and nervousness, and claustrophobia. He did not include obesity in his list of impairments. His height was 5'8" and he weighed 195 lbs. Tr. 658.

In a function report, Quiles claimed being absent from work frequently for treatment and rest. The pain and asthma caused insomnia. The medications kept him sedated, did not take away the pain, and impeded him from driving or working with computers and numbers. Tr. 87-88. "I can barely walk with a cane due to my asthma and pinched nerves." Tr. 88.

Quiles claimed having difficulty doing some tasks of daily living. He had to lie down or sit to get dressed. He showered sitting down and holding on to handles. He could not do house or yard work. He did not have problems taking care of his hair, shaving, or feeding himself, and did not need help or reminders to care for his needs or take his medications. He check-marked that he could go out alone, drive, shop, and handle funds. Quiles also check-marked that his conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. He could walk for approximately thirty feet before needing to stop and rest for around thirty to forty-five minutes. He used a cane, walker, wheelchair, and glasses. Tr. 88-93.  Quiles also claimed having depression, but could pay attention as long as necessary, follow written and spoken instructions, finish what he started, and get along with authority figures, but did not socialize with others.  Tr. 91-93.

Consultative internist Dr. Fernando Torres-Santiago evaluated Quiles on August 12, 2016, and diagnosed arterial hypertension, DM (no insulin required), acquired bronchial asthma, multilevel multifactorial degenerative disc and joint disease resulting in spinal canal stenosis and neural foramina narrowing, post traumatic right knee degenerative joint disease and suprapatellar joint effusion, lower limbs neuropathies, chronic smoker, obesity, and anxiety/sleeping problems. Quiles was obese, with a BMI of 32. His gait and station were normal. He did not limp or use a walking aid. Hand function and strength were normal. There was evidence of right knee swelling with mild ballooning and augmented local temperature. Shoulder, elbow, wrist, finger, cervical and

thoracic back, hip, left knee, and ankles ROM were normal. As to his lumbar back region, Quiles had normal lateral flexion, but performed flexion-extension with discomfort at 60 degrees, and there was evidence of a muscle spasm. As to his right knee, Quiles performed flexion-extension up to 135 degrees (on a scale of 0 to 150 degrees). Lumbosacral spine x-ray showed discogenic disease, degenerative spondylosis, and vascular calcification. Right knee x-ray showed degenerative joint disease and joint effusion. Chest x-ray showed atherosclerotic disease. The rest of the physical exam was normal. Tr. 1000-1010. Dr. Torres commented that "[c]laimant is unable to work due to post traumatic [osteoarthritis]." Tr. 1003.

Consultative psychologist Dr. Evelyn García-García evaluated Quiles on August 13, 2016. Quiles reported that his lower back and sciatic nerve problems arose after slipping at work, and that his asthma was caused after a chemical intoxication while cleaning his house bathroom. Quiles suffered from insomnia and anxiety and was being treated by Dr. Alicea but had no history of psychiatric hospitalizations. He also suffered from diabetic neuropathy and high blood pressure. His daily activities included getting up, washing up, eating breakfast, and going back to bed. He received asthma treatment every four hours. He could not walk properly or do any house or yard work. He drove around for leisure. Dr. García found that Quiles was cooperative and communicative. His mood was calm, nice, and optimistic. His thought process was logical, coherent, and oriented in time, place, and person. His affect was normal. He also had a good response to his pharmacological treatment. Quiles answered questions that tested his immediate, short-term, and recent memory without major effort and was able to correctly solve math problems. Attention and concentration were adequate (he could spell "mundo" backwards, count from 20 to 1, and say the days of the week backwards without difficulty). Intellectual functioning and judgment were adequate. Quiles recognized and accepted having limitations in his life and followed recommendations and treatment. Dr. García diagnosed major depressive disorder, recurrent, moderate; anxiety disorder, unspecified; and primary insomnia. Prognosis was guarded. Tr. 360-366.

Dr. Iván Arzola, non-examining consultant, assessed on August 30, 2016, an RFC for light work with environmental limitations. Listing 1.02 Dysfunction – Major Joints was considered. Osteoarthrosis, obesity, and asthma were determined to be severe impairments, and hypertension, DM and affective disorders as non-severe. Tr. 503. Dr. Arzola assessed that Quiles could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for a total of four

hours; sit for six hours total; push and/or pull limited in his right extremity; climb ramps/stairs and ladders/ropes/scaffolds occasionally; and balance, stoop, crouch or crawl occasionally. He had no manipulative, visual, or communicative limitations, but did have environmental limitations. He could work in extreme cold or heat, wetness, humidity, noise, vibration, and hazards (machinery or unprotected heights). He should avoid moderate exposure to fumes, odors, dust, gases, and poor ventilation. Tr. 506-507.

Dr. Zulma Nieves, psychologist, considered Listing 12.04 Affective Disorders and assessed that the totality of the evidence on record sustained a slight condition with no significant limitations in cognitive or social functioning, and therefore proposed a PRTF for non-severe. Tr. 504-505.

The claim was initially denied at step four on September 30, 2016, with a finding that Quiles's limitations affected his ability to perform some work-related tasks, but that he retained the RFC to perform light work and thus could perform his previous job as a loan officer (Dictionary of Occupational Titles ("DOT") Code 241.367-018, sedentary) as he actually performed it. Tr. 74, 508-509, 520, 530.

In November 2016, Quiles requested reconsideration, claiming changes in his conditions since October 2016. Tr. 539, 692. Quiles claimed that the pain in his waist was more intense and frequent than before, and that he could not stand or sit for too long. He lost coordination to write, feed himself, walk, and get up. He also reported occasionally socializing and talking about daily living activities with other people. Quiles added using his hands in the check-marked list of affected abilities. Now, he could only lift six pounds and walk twelve feet before having to stop and rest for five to ten minutes. He had difficulty with coordination when going up and down stairs. He also now had difficulty following written instructions. He also now used an orthopedic belt and knee brace due to surgery. Tr. 98-104, 692.

On February 6, 2017, Dr. Pedro Nieves affirmed the initial assessment as written, finding that new evidence submitted for reconsideration did not support further physical restrictions. Tr. 521, 524-526. Dr. Gladys Jiménez-Nieves, psychologist, found that the record did not contain evidence to support changes in the severity of his condition and affirmed the previous mental assessment. Tr. 523.

The claim was denied on reconsideration on February 7, 2017, with the same finding as that of the initial determination denying benefits. Tr. 78, 526-527, 529.

At Quiles's request (Tr. 544), a hearing before ALJ Ruy Díaz was held on March 13, 2019. Tr. 39-64. Quiles testified as to his age, weight, height, physical conditions, academic background in accounting and commercial administration (Bachelor's degree), and work at a credit union for 38 years. In his first job at the credit union as head teller, he would handle funds (coins and bills) and, at heaviest, would carry fifty pounds to the vault. His last nine years there were as a credit officer, and he had to stand and walk around constantly and carry twelve pounds on average (a portfolio with a laptop). Quiles testified that he had lower back degenerative problems that worsened with his work fall and, along with the medications that made him sleepy, impeded his ability to move around as before. The heaviest thing he could now carry was a gallon of water. He could not do household chores and hired weekly help for housekeeping duties. He could drive and walk without a cane. He could sit for thirty minutes without having to stand up. If he sat for over thirty minutes, his legs would go numb. He could walk fifty meters on a flat surface, the equivalent of ten to fifteen minutes, before needing to stop to rest. Tr. 43-56.

Vocational expert ("VE") Dr. Héctor Puig testified that the head teller position was supervisory. It was light work with an SVP of eight. The credit or loan officer position was skilled, sedentary work with an SVP of six. The ALJ asked the VE if a person like Quiles (same age – then 63 years old, academic background, and vocational experience) but with the following limitations could perform Quiles's past work: lift or carry twenty pounds occasionally and ten pounds frequently; push and pull as much as he can lift and carry; sit for six hours and stand for three minutes after every hour sitting; stand for six hours and sit for three minutes after every hour standing; walk for six hours and sit for three minutes after every hour walking; frequently climb stairs and ramps; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never work in unprotected heights; and occasionally work exposed to moving mechanical parts, humidity, wetness, dust, odors, fumes and other pulmonary irritants, vibrations, or extreme cold or heat. The VE answered that this residual allowed for light work, therefore he would be able to do both jobs. Tr. 57-58.

For the second hypothetical question, the ALJ asked if such a person with the limitations of the first hypothetical but limited to lifting or carrying ten pounds occasionally and less than ten pounds frequently could perform past work. The VE answered that this residual allowed for sedentary work, therefore he could perform the loan officer job but not the tasks of head teller. Tr. 58-59.

For the third scenario, the ALJ asked if such a person with the following limitations could do Quiles's past work: lift or carry ten pounds occasionally and less than ten pounds frequently; push and pull as much as he can lift and carry; sit for six hours and stand for two minutes after every thirty minutes sitting; stand for six hours and sit for two minutes after every thirty minutes standing; walk for six hours and sit for two minutes after every thirty minutes walking; operate foot controls occasionally; frequently climb stairs and ramps; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, and kneel; never crouch or crawl; never work in unprotected heights; and occasionally work exposed to moving mechanical parts, humidity, wetness, dust, odors, fumes and other pulmonary irritants, vibrations, or extreme cold or heat. The VE answered that this residual also allowed for sedentary work, and he could perform the loan officer job. Tr. 59-60.

The ALJ added to the third hypothetical that the person would be off-task 15% of the time besides normal work breaks. The VE answered that there was no work, past or alternate, that such a person could do. Tr. 60.

The VE also answered that his testimony was consistent with the DOT. *Id.* To counsel's questions, the VE acknowledged that there was a discrepancy between the description Quiles gave for the loan officer position as he performed it and its description in the DOT. As described by Quiles, it was light work, but as per the DOT, it was sedentary. Tr. 61. The VE also answered that given the second hypothetical with the job description provided by Quiles, the medical-vocational rule applied and Quiles would not be able to do past relevant work or any work in the national economy. Tr. 62-63.

On March 22, 2019, The ALJ found that Quiles was not disabled under sections 216(i) and 223(d) of the Act. Tr. 21-32. The ALJ sequentially found that Quiles:

(1) had not engaged in substantial gainful activity since his alleged onset date of June 18, 2016 (Tr. 23);

(2) had severe impairments: cervical and lumbar degeneration, bilateral knee dysfunction, thoracic spondylosis, peripheral neuropathy, and asthma (Tr. 23);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526), particularly sections 1.02A, 1.02B, 1.04A, 3.02, and 3.03 (Tr. 25); and

(4) retained the RFC to do sedentary work as defined in 20 C.F.R. 404.1567(a) with the following limitations: lift, carry, push, and pull ten pounds occasionally and less than ten pounds frequently; sit for six hours and stand for two minutes after every thirty minutes sitting; stand or walk for two hours and sit for two minutes after every thirty minutes standing or walking; operate foot controls occasionally; frequently climb stairs and ramps; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, and kneel; never crouch or crawl; never work in unprotected heights; and occasionally work exposed to moving mechanical parts, humidity, wetness, dust, odors, fumes, and other pulmonary irritants, vibrations, extreme cold or heat, or vibrations. Quiles was therefore capable of performing past relevant work as a loan officer. Tr. 26, 31.

The ALJ found that Quiles's high blood pressure, DM, cataracts, obesity with a BMI of 32, and major depressive disorder were non-severe impairments. Tr. 23-24. The ALJ also found that Quiles's medically determinable impairments could reasonably be expected to cause the symptoms that he alleged, however, his statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence in the record. Tr. 22.

On May 3, 2020, the Appeals Council denied Quiles's request for review of the ALJ's decision, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1-8, 621-624. The present complaint followed. ECF No. 1.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step four that Quiles had the RFC to perform past relevant work as a loan officer. Quiles claims that the ALJ erred (1) in assessing Quiles's obesity through the sequential evaluation process, (2) in assessing that Quiles had the RFC to perform sedentary work, and (3) by improperly classifying the loan officer position as sedentary as per the DOT description instead of as light as he performed the position. ECF No. 13. The Commissioner maintains that substantial evidence supports the ALJ's decision. ECF No. 15 at 8.

In reviewing the record for substantial evidence that supports or not the ALJ's step two through four findings, I am mindful that the claimant is responsible for providing the evidence of an impairment and its severity; the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982) (citing *Richardson v. Perales*, 402 U.S. 389 (1971)). A medically determinable impairment or combination of impairments "must result from

anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521. It "must be established by objective medical evidence from an acceptable medical source," and cannot be based on a claimant's "statement of symptoms, a diagnosis, or a medical opinion." *Id.* "Objective medical evidence means signs, laboratory findings, or both." 20 C.F.R. § 404.1502(f). "Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [symptoms]." 20 C.F.R. § 404.1502(g). "Laboratory findings means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques." 20 C.F.R. § 404.1502(c). "Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X–rays), and psychological tests." *Id.*

Quiles argues that the ALJ failed to properly evaluate obesity throughout the sequential evaluation process, that is, when determining at step two that Quiles's obesity was not a severe impairment, in failing to find at step three that obesity met or medically equaled the severity of a listed impairment when in combination with other impairments, and by not considering at step four how obesity limited function. Quiles also argues that the ALJ disregarded the opinion of the medical experts for his own lay opinion and did not explain the reasoning behind the step findings. ECF No. 13 at 17-21.

The ALJ determined as per 20 C.F.R. § 404.1520(c) and SSRs 85-28 and 96-3p that Quiles had severe impairments which limited his ability to perform basic work activities (cervical and lumbar degeneration, bilateral knee dysfunction, thoracic spondylosis, peripheral neuropathy, and asthma) and that imaging and other objective medical testing pertaining to the non-severe physical impairments (high blood pressure, DM, cataracts, and "obesity with a BMI of 32") did not significantly impair Quiles's ability to perform basic work-related activities. Tr. 23. There is no further mention in the decision of Quiles's obesity beyond this statement.

Step two demands a determination of two things: (1) whether a claimant has a medically determinable impairment or combination of impairments, and (2) whether the impairments or combination of impairments is severe, that is, that it significantly limits or is expected to significantly limit the ability to perform basic work-related activities for twelve consecutive months. *Bowen v. Yuckert*, 482 U.S. 137, 140–41 (1987); 20 C.F.R. §§ 404.1520(a)(4)(ii) &

404.1520(c); 20 C.F.R. § 404.1521; SSR 02-1p. An impairment is non-severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. Physical work functions include such things as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. 20 C.F.R. §§ 404.1522(a) & 404.1522(b)(1); SSR 85-28.

After reviewing the evidence on record as summarized above, I am convinced that the record supports a finding of non-severity as to obesity.  There is evidence that Quiles was obese, but evidence and opinions in the record regarding severity as defined above or how obesity affected performance of basic activities in conjunction with other impairments is scarce. 2016 progress notes from treatment with Dr. Mercado and Dr. Benero indicate that Quiles's BMI was 30.1 and that he was placed on a diabetic/low fat diet. He was having trouble walking due to back and knee pain, and used a cane and knee brace for support, but otherwise did not need assistance with his activities of daily living. Tr. 380-385, 408-414. Dr. Caro assessed in December 2017 that Quiles's BMI was 32.4, with no opinion that obesity affected his asthma. Tr. 1123. Progress notes dated 2018 from treatment with Dr. Camacho show that his BMI was between 30-31, and there are check-marked findings that Quiles was a fall risk due to his age and not to his physical conditions, and that he did not require assistance to self-care. Tr. 439-451. Quiles's BMI at the time of his right knee replacement by Dr. Báez in May 2018 was 29.6. Tr. 422. Both Dr. Vargas and Dr. Báez, who operated Quiles's back and knee respectively, imposed physical restrictions post-op, but there is no evidence that these restrictions were related to or affected by obesity. Tr. 416-417. Upon applying for disability benefits, Quiles did not list obesity as one of his impairments. Tr. 658. Dr. Torres-Santiago, consultative internist, calculated that Quiles's BMI was 32, and was therefore obese, but offered no opinion as to obesity's limiting effects. Dr. Torres-Santiago stated that Quiles had an obese constitution, but did not use walking aid, did not limp, and his gait and station were normal. Tr. 1002. Dr. Torres-Santiago did address right knee and lumbar spine ROM, for which the record as a whole has ample evidence of treatment, and opined that Quiles was unable to work due to post traumatic osteoarthritis (a determination reserved for the Commissioner), not obesity. Tr. 1003. Dr. Arzola, state medical consultant, assessed that obesity was a severe impairment but nonetheless Quiles could perform light work, and Dr. Nieves affirmed. Tr. 503, 506-507, 521. And, Quiles did not testify at the hearing before the ALJ about obesity affecting his ability to work, only about his back, knee, and asthma. Tr. 43-56.

Also, obesity is not in and of itself a disability under the Act, as there is no listing under the Act for obesity. *See* Titles II & XVI: Evaluation of Obesity, SSR 02-1p, 2002 SSR LEXIS 1 (S.S.A. September 12, 2002).[1] However, obesity on its own could be medically equivalent to a listed impairment under certain circumstances, and obesity and another impairment or impairments in combination can meet the requirements of a listing. *Id.* "'In the context of judicial review of the ALJ's decision, [plaintiff] ha[s] the burden of showing specifically how the obesity, in combination with other impairments, limit[s] her ability to a degree inconsistent with the ALJ's RFC determination.'" *Durant-Irizarry v. Comm'r of Soc. Sec.*, Civil No. 14-1444 (MEL), 2015 WL 8514587, at *4 (D.P.R. Dec. 11, 2015) (quoting *Smith v. Astrue*, 639 F.Supp.2d 836, 847 (W.D. Mich. 2009) (modifications in original)); *see also, e.g.*, *Newell v. Colvin*, No. 12-CV-480-S, 2014 WL 546761, at *6 (D.N.H. Feb. 10, 2014) (collecting cases); *Connor v. Colvin*, Civil No. 14-40163-TSH, 2016 WL 4358117, at *9 (D. Mass. Mar. 31, 2016). This applies to step three determinations as well. *See, e.g.*, *Averill v. Astrue*, Civil No. 09-445-P-H, 2010 WL 2926267, at *6 (D. Me. July 16, 2010). "Plaintiff must do more than merely introduce evidence of his obesity; rather, he must specifically show how obesity affects his abilities needed for gainful employment." *Durant-Irizarry*, 2015 WL 8514587 at *4. "In other words, '[i]t [is] not enough ... to argue that the evidence shows that [plaintiff] suffers from some of the usual effects of morbid obesity.'" *Id.* (quoting *Smith*, 639 F.Supp.2d at 847) (modifications in original).

Quiles argues that the record shows that he suffers from obesity without crafting any argument that his obesity affects his ability to pursue and retain gainful employment; he merely suggests that in theory, obesity could exacerbate other symptoms without explaining how or showing that his obesity actually did have an effect. *See* ECF No. 13 at 22. Prior decisions make it clear that this is not enough for Quiles to meet his burden of proof. Accordingly, Quiles's claim that the ALJ overlooked Quiles's obesity at step three and failed to properly consider his obesity at step four fails.

Additionally, "an ALJ's failure to explicitly address a claimant's obesity does not [in and of itself] warrant remand." *See Guadalupe v. Barnhart*, No. 04 CV 7644 HB, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552–53 (3rd Cir. 2005) and *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)). The ALJ's failure to explicitly

---

[1] Rescinded and replaced by SSR 19-2p effective May 20, 2019, after the ALJ's decision in this case.

evaluate obesity at step three and when determining Quiles's RFC were at most harmless error. Quiles fails to point to a single instance in which his physicians noted that his weight exacerbated any of his other symptoms, nor does he note a single occasion where his physicians said anything regarding Quiles's obesity that would suggest that his obesity independently reached the level of a listed impairment. Moreover, the record does not support the notion that Quiles's obesity would have been likely to significantly exacerbate his other symptoms or reach the level of a listed impairment.

Moving on, Quiles argues that the loan officer position was wrongly classified as sedentary as per the DOT description despite plaintiff's description of his duties, which match the requirements of light exertion and would have resulted in a finding of disabled as per the Medical-Vocational Rule. Quiles adds that the ALJ failed to provide a reason for choosing the sedentary DOT definition over the duty description as performed. ECF No. 13 at 14-16. The Commissioner points to SSR 82-61 and asserts that it remains the claimant's burden at step four to show inability to return to past relevant work. ECF N. 15 at 8.

SSR 82-61 clarifies policy regarding a claimant's ability to perform past relevant work, and states that under 20 C.F.R. §§ 404.1520(e) and 416.920(e), a claimant will be found to be "not disabled" when it is determined that he retains the RFC to perform "[t]he actual functional demands and job duties of a particular past relevant job" OR "[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy." SSR 82-61 further clarifies that there are three possible tests to determine whether a claimant retains the RFC to perform past relevant work: (1) whether he can perform the past relevant job based on a broad generic occupational classification of the work, (2) whether he can perform the functional demands and duties of the past relevant job as he actually performed it, or (3) whether he can perform the functional demands and job duties of the past relevant job as ordinarily required by employers throughout the national economy. 1982 SSR LEXIS 31. SSR 82-61 explains that:

> A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled." *Id.*

SSR 82-61 and 20 C.F.R. § 404.1560(b) add that the services of a VE may be used in determining how a particular job is performed when there are significant variations between a claimant's description and the description shown in the DOT. In the disability report filed along with his application, Quiles listed "loan officer" as his most recent job, from 1979 to 2016, which required him to lift at most 15 pounds, walk for 3 hours, stand for 2.5 hours, sit for 3.5 hours, climb/stoop/kneel/crouch for 4 hours, never crawl, and handle/write/type/reach for 6 hours. Tr. 659-660. The VE testified that there was a discrepancy between the description Quiles gave for the loan officer position as he performed it and its description in the DOT. As described by Quiles, it was light work, but as per the DOT, it was sedentary. The VE also testified that the second and third hypothetical questions allowed for sedentary work and Quiles would be able to perform the loan officer job, but given the job description provided by Quiles, the medical-vocational rule applied and Quiles would not be able to do past relevant work or any work in the national economy. Tr. 61-63.

Therefore, regulations allow for the ALJ to make a finding of "not disabled" at step four based on the DOT description of past relevant work. The ALJ "asked for the VE's opinion in order to assess how the exertional limitations affect the claimant's ability to perform the [past relevant work] from the [alleged onset date] through present. Dr. Puig stated that the claimant can perform the [past relevant work] of Loan Officer, as generally performed." Tr. 31. Because "[a] claimant is in turn deemed capable of performing his past relevant work if his RFC allows him to do the job [e]ither as the claimant actually performed it or as generally performed in the national economy," Quiles's argument that the ALJ erred when classifying the exertion level of his previous work without explanation fails. *Seda Sánchez v. Comm'r of Soc. Sec.*, No. 19-1801 (MEL) 2021 U.S. Dist. LEXIS 42056, at \*19-20 (D.P.R. Mar. 4, 2021) (internal quotations and citations omitted).

As to the ALJ's RFC finding that Quiles retained the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) with some additional limitations, Quiles asserts that the third hypothetical presented to the VE was the RFC ultimately adopted by the ALJ. ECF No. 13 at 13. This is not literally true, as per the transcript. Comparing the third hypothetical question (Tr. 59-60) to the RFC assessment in the decision (Tr. 26), the ALJ's RFC finding is more restrictive than the RFC presented to the VE in the third hypothetical; the difference being that the ALJ assessed that Quiles retained the RFC to stand or walk for two hours alternated with two minutes sitting after every thirty minutes of doing the activity (Tr. 26) instead of the six hours standing or walking

alternated with two minutes sitting every thirty minutes posed in the third hypothetical question to the VE. Tr. 59-60.

Sedentary work is defined as work that requires lifting no more than ten pounds at a time, sitting for at least six hours out of an eight-hour workday, occasional walking and standing for no more than about two hours a day, and good use of the hands and fingers for repetitive hand-finger actions. 20 C.F.R. § 404.1567(a); SSR 83-10. Light work requires lifting no more than twenty pounds at a time and standing or walking, off and on, for a total of approximately six hours in a workday (20 C.F.R. § 404.1567(b); SSR 83-10), and "[e]ven though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing – the primary difference between sedentary and most light jobs." SSR 83-10. The VE testified that the residuals posed in the second and third hypothetical questions allowed for sedentary work, such as the loan officer job, to be performed and not the light job as head teller. Tr. 58-60. The ALJ concluded, when giving little weight to Dr. Báez's light work RFC assessment, that "[m]y RFC for sedentary work is more beneficial to the claimant, and it is also more in line with the evidence submitted at this level." Tr. 31.

I find the evidence in record substantially supports the RFC assessment. In addition to the evidence discussed above for step two, the record also contains ample evidence regarding for Quiles's back and knee conditions, which limit his ability to sit, stand, and walk. The evidence is vast as to treatment and operations of his back and knee conditions, with numerous occasions on the record when treatment notes indicate difficulty walking. Focusing on the evidence post-surgery and closer to the hearing decision, I note that Quiles's orthopedic surgeons, Dr. Vargas and Dr. Báez, assessed in 2017 and 2018 that Quiles could lift, carry, push, or pull no more than fifteen pounds; balance, stand, or sit without changing positions for more than thirty minutes; walk long distances (no more than 100 meters); climb more than ten steps non-stop; and should not squat or perform activities that required sudden movements; or consecutively bend or twist. The ALJ stated having considered Quiles's musculoskeletal/joints disorders when including postural and environmental limitations to address spine and knees degeneration. Tr. 28. Quiles testified that he could sit for thirty minutes without having to stand up and drive (which is in the sitting position). He could lift a gallon of water, which is roughly ten pounds. He could walk without a cane for fifty meters or for about ten to fifteen minutes before needing to stop and rest.  Dr. Torres-Santiago, who examined Quiles before his surgeries, found that Quiles's gait and station were normal. He

did not limp. Hand function and strength were normal. Shoulder, elbow, wrist, finger, cervical and thoracic back, hip, left knee, and ankles ROM were normal. The state agency non-examining consultants, Dr. Arzola and Dr. Nieves, assessed that Quiles could perform light work, but these RFC assessments predate the surgeries as well, as so acknowledged and accounted for by the ALJ at Tr. 29. And although a bit older, evidence from 2016 at the Buen Samaritano Hospital, prior to surgery when Quiles was actively pursuing treatment for his back and knee conditions, indicates that his musculoskeletal and neurological systems were normal. Muscle strength was 5/5. Also, Quiles treated his asthma with medications. Treatment notes also shed light as to Quiles's compliance with treatment for asthma, DM, and hypertension; although around 2016 there might have been some inconsistency or incompliance, later notes indicate continuity of treatment with medications.

On a final note, Quiles also cursorily states that the ALJ failed to consider his mental impairments. ECF No. 13 at 23. However, the ALJ specifically held that Quiles's medically determinable mental impairment of major depressive disorder was a non-severe impairment, Tr. 24, and Quiles offers no argument or evidence to support his claim. Accordingly, the claim is waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence (*see Ortiz*, 955 F.2d at 769 (citing *Rodríguez*, 647 F.2d at 222); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987)). After thoroughly and carefully reviewing the record, I find that there is substantial evidence to support the ALJ's findings in this case.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 29th day of March, 2022.

*s/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge